23575

Steven W. HAMM, Consumer Advocate for the State of South Carolina, Appellant v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION and Carolina Power and Light Company, Respondents. NUCOR STEEL, A DIVISION OF NUCOR CORPORATION, Appellant v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION; Carolina Power and Light Company; Steven W. Hamm, Consumer Advocate for the State of South Carolina; The South Carolina Energy Users Committee; and Shaw Air Force Base, on behalf of the Federal Executive Agencies of the United States of America, Respondents, of whom Steven W. Hamm is also an Appellant (Two Cases). CAROLINA POWER AND LIGHT COMPANY, Petitioner-Respondent v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION, Respondent.

(414 S.E. (2d) 149)

Supreme Court

*Steven W. Hamm, Raymon E. Lark, Jr.,* and *Elliott F. Elam, Jr.,* Columbia, *for appellant South Carolina Dept. of Consumer Affairs.*

*Francis P. Mood,* of *Sinkler & Boyd, P.A.,* Columbia, and *Garrett A. Stone* of *Ritts, Brickfield & Kaufman,* Washington, D.C., *for appellant Nucor Steel, Inc.*

*Marsha A. Ward & Gayle B. Nichols,* Columbia, for *respondent South Carolina Public Service Com'n.*

*William F. Austin,* Columbia, and *Len S. Anthony,* of Raleigh, N.C., *for respondent Carolina Power and Light Co.*

*Major Robert F. Russell* of *Shaw Air Force Base,* and *Major Gary A. Enders* of *Tyndall Air Force Base, for respondent Shaw Air Force Base.*

*Arthur G. Fusco* of *Sherrill & Rogers, P.C.,* Columbia, for *respondent South Carolina Energy Users Committee.*

Heard Jan. 8, 1992; Decided Feb. 10, 1992.

Reh. Den. March 11, 1992.

MOORE, Justice:

This is an electric utility rate case in which two intervenors appeal the order of respondent Public Service Commission (PSC) granting a rate increase to respondent Carolina Power and Light Company (CPL). Appellant Nucor Steel, CPL's largest South Carolina customer, appeals the denial of its request for a discount rate; appellant Consumer Advocate (Hamm) contests certain amounts included in the approved rate base. The circuit court affirmed PSC's order. We affirm.

## ISSUES

(1) Is PSC's order on rehearing void?

(2) Did the parties timely appeal to the circuit court?

(3) Is there substantial evidence to support PSC's finding that Nucor is not entitled to a Distribution Service Voltage Discount?

(4) Is there substantial evidence to support PSC's findings regarding rate base?

## FACTS

This case has a long and complex procedural history. In March 1988, CPL applied for a rate increase amounting to $47.8 million in additional revenue. In August 1988, PSC issued its order allowing increased rate revenue of $25 million. On appeal, however, the circuit court found PSC's findings insufficient and in May 1990 remanded the case for specific findings pursuant to *Able Communications, Inc. v. South Carolina Public Service Comm'n*, 290 S.C. 409, 351 S.E. (2d) 151 (1986).

On July 9, 1990, PSC reissued its 1988 order with specific findings. On July 19, Nucor filed a petition for rehearing. Hamm filed a petition for rehearing on July 23.

On July 31, Hamm received notice of a PSC directive ruling on the merits of only one of the issues raised in Hamm's petition for rehearing. PSC voted to suspend consideration of the remaining issues raised in the parties' petitions for rehearing in light of the circuit court's assertion

of jurisdiction over the case.[1] The record does not indicate Nucor received any notice of PSC's action on July 31.

On September 7, Nucor filed a petition for judicial review in circuit court. On September 13, PSC issued its order on rehearing which Hamm received on September 20. Hamm filed a petition for judicial review in circuit court on October 10.

## DISCUSSION

Nucor contends PSC's September 13 order on rehearing is void because it was issued more than twenty days after Nucor's petition for rehearing was filed.

S.C. Code Ann. § 58-27-2150 (1976), which governs rehearings of matters involving electric utilities, provides:

> After an order or decision has been made by the Commission any party to the proceedings may within ten days after service of notice of the entry of the order or decision apply for a rehearing in respect to any matter determined in such proceedings and specified in the application for rehearing, and the Commission may, in case it appears to be proper, grant and hold such rehearing. *The Commission shall either grant or refuse an application for rehearing within twenty days, and a failure by the Commission to act upon such application within that period shall be deemed a refusal thereof.* (Emphasis added.)

Under this statute, we find PSC's order on rehearing is not void because PSC *did* act on the petitions for rehearing within twenty days as required. The fact the written order on rehearing was not issued until after expiration of the twenty-day period is not determinative. Under the plain language of the statute, all that is required is that PSC must "act upon" a petition for rehearing within that time period. Here, PSC considered both parties' petitions and voted to defer to the circuit court's assertion of jurisdiction. It is not fatal to the

---

[1] The circuit court's assertion of jurisdiction was improper since the case had been remanded to PSC and the order remanding it did not retain jurisdiction of any part of the case. The circuit court subsequently agreed with the parties it had no jurisdiction.

validity of PSC's order on rehearing that Nucor did not receive notice of its action taken within the twenty-day period.

Further, S.C. Code Ann. § 58-27-2310 (1976), which governs appeals in matters involving electric utilities, provides in pertinent part:

[N]o cause of action shall accrue to vacate or set aside, either in whole or in part, any order of the Commission, except an order on a rehearing, unless a petition to the Commission for a rehearing has been filed and refused or deemed refused because of the Commission's failure to act thereon within twenty days. *Any action brought hereunder must be commenced within thirty days from the date of service of notice of the order of the Commission on a rehearing or of its refusal of a petition for rehearing, either by order or failure to act thereon within twenty days.* (Emphasis added.)

Under this statute, the parties' time to appeal is measured from notice of PSC's denial of a petition for rehearing "either by order or failure to act thereon within twenty days." Because of the impact on the circuit court's jurisdiction to determine an appeal of a PSC order, we address the issue of timeliness of the parties' appeals to the circuit court in this case to clarify the operation of §§ 58-27-2150 and 58-27-2310.

As discussed above, Nucor received no notice of any PSC action on Nucor's petition for rehearing within twenty days of its filing. Nucor therefore properly filed an action for judicial review in the circuit court within thirty days of expiration of the twenty-day period for PSC to act. Hamm, on the other hand, did receive notice of PSC's action on his petition for rehearing within the twenty-day period following its filing. Hamm therefore properly filed an action for judicial review in circuit court within thirty days of receipt of the written order on rehearing.

In conclusion, when an order on rehearing is issued by PSC more than twenty days after the filing of the petition for rehearing, the circuit court has jurisdiction of an action for judicial review if: (1) the appealing party received notice within twenty days of filing a petition for rehearing that PSC acted on the petition and the party filed

an action for judicial review within thirty days of receipt of PSC's order on rehearing; *or* (2) the appealing party received no notice within twenty days of filing a petition for rehearing that PSC acted on the petition and the party filed an action for judicial review within thirty days of expiration of the twenty-day period.

Concluding the circuit court properly exercised jurisdiction in both appeals, we now address the merits of each.

## NUCOR APPEAL

In 1987, PSC approved the following Distribution Service Voltage Discount:

> When Customer owns the step-down transformation and all other facilities beyond the transformation, except Company's metering equipment, *necessary to take service at the voltage of the distribution line of 12.47 kV or higher from which Customer receives service,* the charge per kW and per kWh will be reduced by $0.60 per kW and $.0001 per kWh. The *distribution line source* must be from other than a transmission-to-distribution substation built exclusively for Customer's use in order to qualify for the distribution Service Voltage Discount.

In this action for a rate increase, CPL sought to change the provision regarding the substation from "built exclusively" to "built primarily" for the customer's use. PSC approved CPL's proposed revision and found Nucor ineligible for this discount because Nucor does not receive service from a distribution line. It concluded the revision from "exclusive" to "primarily" did not affect Nucor since Nucor was not eligible for this discount in any event.

Nucor contends it is entitled to the refund under the original 1987 tariff and further that CPL should not be permitted to discriminate against it by changing the substation requirement from "exclusively" to "primarily" in order to exclude Nucor from the discount.[2]

---

[2] The substation in question serves both Nucor and another customer, Nucor Cold Finish Co.

On appeal from a PSC order, factual findings will be affirmed if supported by substantial evidence. *Hamm v. American Telephone & Telegraph Co.*, 302 S.C. 210, 394 S.E. (2d) 842 (1990); *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 276 S.E. (2d) 304 (1981). The record indicates Nucor does not take service from a CPL distribution line as required under the language of the tariff: "the distribution line . . . from which the customer *receives* service." Although Nucor does take service at the voltage of 12.47 vK as required in the tariff, its service agreement with CPL specifies the point of delivery for electricity is at the point where Nucor's conductors are connected to the bus, or heavy conductor, *within* CPL's substation. Thus, Nucor does not "receive service" from a CPL distribution line whose source is from the substation as required by the plain language of the tariff. We find the record supports PSC's finding Nucor is ineligible for the requested discount regardless of whether the substation was built exclusively, or merely primarily, for Nucor.

## HAMM APPEAL

In 1987, CPL completed construction of its Shearon Harris Nuclear Plant for a total cost of $3.9 billion.

Pursuant to CPL's 1987 application for a rate increase, PSC allowed 50% of the Harris Plant expenses to be included in a new rate base and deferred the remaining 50%. In this 1988 action, CPL sought an increase in rate base to include the remaining 50% costs of the Harris Plant.

The Harris Plant was originally designed in 1971 to accommodate a burgeoning load growth in consumer demand. Its design is a "cluster" formation which consists of four reactors with common facilities serving all four. The common facilities include fuel handling, waste processing, reservoir intake and discharge, water treatment, and several support buildings. After many delays, construction began in 1978. Eventually, three of the reactors were cancelled to adjust to a reduced consumer load growth and the Harris Plant was completed with only one reactor. The common facilities, originally intended for four reactors, function only for this one reactor. These common facilities cost CPL approximately $569 million.

Of the $569 million in costs attributable to the common facilities, PSC allowed $130 million included in the rate base for the spent fuel storage facility and excluded the remaining $440 million as excess common facilities. Hamm contends the entire $569 million should be excluded plus an additional $241 million in cost overruns Hamm claims are attributable to CPL's mismanagement of the Harris Plant construction. In addition to the Harris Plant costs, Hamm also contests the inclusion in rate base of certain legal fees, payroll expenses, and depreciation allowance.

First, Hamm argues the entire $569 million cost of common facilities should be excluded from rate base because this cost was imprudently incurred by CPL. *See Hamm v. South Carolina Public Service Comm'n*, 291 S.C. 119, 352 S.E. (2d) 476 (1987). Hamm contends the Harris Plant cluster design was imprudent in light of the decreasing load growth during the 1970's and 80's. He claims a "slide-along" design should have been used because each reactor would then have been planned with its own support facilities which could be cancelled when a reactor was cancelled. CPL, on the other hand, contends the cluster design was the most economical and would have been the best way to meet demand but for several unpredictable events, including the OPEC embargo, Three-Mile Island nuclear accident, and the Iranian revolution, which caused innumerable delays and affected load growth and cost of nuclear construction.

The record is replete with evidence the cluster design was an economical and efficient choice in the early 1970's when consumer demand was increasing at a tremendous rate and CPL was pressed to plan for additional generation. As electricity rates rose, however, due in part to a sharp increase in oil prices, consumers cut back on their use of electricity. As a result, forecasted ten-year load growth fluctuated dramatically from 11% in 1972 to 2.6% in 1984. During this time period, PSC confirmed CPL's load forecasts and continued to require its continued pursuit of generation addition plans. In 1978, when the Harris Plant construction was begun, CPL's service area was still developing economically from the influx of new industry. Moreover, CPL's generation addition plans were approved by PSC. It was not until 1981 that CPL cancelled two of the four Harris

Plant reactors in response to a decline in load growth which was finally perceived as permanent. The third reactor was cancelled in 1983.

We find the record contains substantial evidence to support PSC's finding CPL expenditures on the Harris Plant were prudently incurred in light of contemporaneous circumstances surrounding CPL's construction of a cluster design nuclear plant.

Further, Hamm contests the inclusion in rate base of $130 million for the spent fuel storage facility which was the only cost for common facilities allowed by PSC. Hamm argues there is no evidence to support the conclusion this facility is an asset to CPL or that its value is $130 million. We disagree.

CPL witness Parsons testified that additional cost for the common facilities was $569 million which included "a portion of the cost of the fuel handling building, which includes one of the spent fuel pools." He calculated the value of the spent fuel pool at $130 million. Parsons further testified the amount calculated for the spent fuel facility is what would have been necessary had the plant been designed as a slidealong with independent facilities for each reactor. He testified it could also be used to store spent fuel from other units in the CPL system. This evidence supports PSC's finding.

Next, Hamm contends $241 million in cost overruns should have been excluded because they were due to errors and omissions resulting from CPL's mismanagement of the Harris construction. PSC found cost overruns were caused by regulatory changes responsible for schedule delays and design modifications.

CPL witness Parsons testified that errors and omissions that would otherwise have been routinely corrected during construction by engineers in the field required new documentation under Nuclear Regulatory Commission (NRC) regulatory changes mandating proof of compliance. He testified 79% of all documented errors and omissions were due to regulatory changes. An additional five million work hours were used to document construction problems as required by new NRC regulations. Design modifications regarding seismic and fire protection were also required under new NRC regulations promulgated after the Three Mile Island nuclear

accident. This evidence supports PSC's findings cost overrun was not caused by CPL mismanagement.

Next, Hamm contends PSC erred in allowing legal fees incurred in defending a suit brought by United Mine Workers' Association (UMWA) against CPL's coal mining subsidiaries and in defending an antitrust suit. The amount in question is $28,616.

PSC found rate payers benefitted from CPL's defense of these lawsuits which could have resulted in greater costs to the company. Regarding the UMWA lawsuit, PSC found ratepayers benefitted from CPL's ownership of these mines which provided low-sulphur coal. Although CPL was not allowed to recover for losses associated with ownership of the mines, PSC concluded the company had no control over the institution of a lawsuit against it. Hamm contends, however, these legal expenses should be disallowed because they were not incurred in the rate base test year which is the twelve months ending September 30, 1987.

CPL witness Bradshaw's testimony indicates both the antitrust and UMWA legal fees were incurred in the test year. PSC's findings on this issue are therefore supported by substantial evidence in the record.

Next, Hamm complains PSC improperly allowed CPL to "annualize" the amount of its September 1987 payroll. He claims the increased payroll for 1988 was previously capitalized as an operation and maintenance expense for the Harris Plant, thereby resulting in a double recovery of $215,000.

"Annualization" is an accounting procedure whereby the amount of payroll expense for a single month in the test year is multiplied by twelve to calculate total test year payroll expenses rather than using the actual expense for each month. The purpose is to achieve a test year figure for rate base which more accurately corresponds to the ongoing expense into the rate-paying year. *See Hamm v. Southern Bell Telephone & Telegraph Co.*, 302 S.C. 132, 394 S.E. (2d) 311 (1990) (approving adjustment to test year for known and measurable out-of-period changes in expenses, revenues, and investments). CPL witness Bradshaw testified the annualized September 1987 amount was still lower than actual payroll expenses in 1988. Further, the record indicates expenses

attributable to payroll that were capitalized as Harris Plant operating and maintenance costs were deducted from the payroll expense adjustment to the rate base. Payroll adjustment therefore did *not* result in a double recovery. PSC's findings on this issue are supported by the record.

Finally, Hamm contends PSC arbitrarily allowed CPL to depreciate 95% of the value of its Group III fossil steam property two years before expiration of its useful life.

Group III plants are the company's oldest plants which are operating at below 10-20% capacity. These plants are used as "cycling" units rather than "base load" units. PSC staff witness Sheely testified the rate of deterioration of these plants is far greater than that of base load units. The purpose of depreciation expense is to allow recovery of capital investment, adjusted for net salvage, over the useful life of the facility. Based on the uncertainty of operating Group III plants with such low capacity, PSC concluded it was reasonable to allow 95% depreciation within two years of a Group III plant's expected retirement. We conclude PSC's finding is supported by evidence that the depreciation rate allowed for these plants is linked to an evaluation of their useful life.

Accordingly, the judgment of the circuit court affirming PSC's order is

Affirmed.

HARWELL, C.J., and FINNEY and TOAL, JJ., concur.

CHANDLER, A.J., not participating.